UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:07-74-B-H |
| | ) | |
| TROY LITTLEFIELD, *et al.*, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON
DEFENDANT LITTLEFIELD'S MOTION TO SUPPRESS**

Troy Littlefield has filed a motion to suppress statements he made to law enforcement officers during a custodial interrogation at the federal building in Bangor, Maine. (Doc. No. 337.) On the Court's referral, I conducted an evidentiary hearing on the motion on October 30, 2008. According to Littlefield's testimony at the hearing, his post-Miranda statements were made after he had been told that, if he remained silent and was uncooperative, the judge would be told of his silence and bail would be denied. The three officers who were present during the interview deny that any such statements were made. I now recommend that the Court adopt the following proposed findings of fact and deny the motion.

**Proposed Findings of Fact**

On May 6, 2008, at approximately 7:00 a.m., Troy Littlefield was arrested in the driveway of his home in Linneus, Maine. Littlefield, along with other individuals, had been indicted on November 16, 2007, in connection with an alleged drug conspiracy in the District of Maine during the 2002 – 2005 time frame. Apparently the modus operandi for the May 6 interviews was that individuals were brought to Bangor to be interviewed

by a team consisting of Fred Luce, a Brewer police officer assigned to the drug task force, Stephen Sicard, an agent for the DEA, and John Cremonini, a criminal investigator for the Social Security Administration.  Littlefield was taken into custody and transported to Bangor by officers not directly associated with the case.  Those officers neither questioned Littlefield nor informed him of the nature of the charges against him during the transport to Bangor.

Upon his arrival in Bangor, Littlefield was escorted to an interview room on the first floor of the federal building in Bangor, Maine.  While walking through the corridors he observed two other people in separate interview rooms, Daniel Littlefield and Robert Donath.  Both of these men were known to Troy Littlefield from his past associations in the Lincoln, Maine area and upon seeing them in the interview rooms, Littlefield surmised that he had been arrested for something in connection with illegal drugs.  However, according to Littlefield, he stopped using drugs about two years prior to his arrest and had moved away from Lincoln about one year ago.  Littlefield's employment had taken him to Linneus in northern Maine.

Littlefield is a forty-three year old union construction electrician who is no stranger to the criminal justice system.  He has previously been arrested on three or four occasions.  On one occasion when he was arrested in Lawrence, Massachusetts, Littlefield apparently refused to answer questions, but on a separate occasion when arrested in Lincoln, Maine, Littlefield did choose to answer questions post-Miranda.  Based upon Littlefield's own testimony and his prior arrest record, there is no doubt but that he understood his right not to answer any questions and to have an attorney assigned to represent him at his initial appearance.

2

Following his interview with the officers, at approximately 2:30 P.M. on May 6, Littlefield appeared before me for his initial appearance and counsel was assigned.  A motion for detention previously filed by the Government was set for hearing on May 8, 2008.  The motion was subsequently withdrawn (Doc. No. 103) and the defendant was released on bond on May 8, 2008.

### *Troy Littlefield's Version*

Given his plight on May 6, Littlefield has a pretty clear recollection of his interrogation and he says he recalls what the officers told him.  Sicard informed him that he was charged with two felonies, one involving a conspiracy count, and explained the nature of the charges to him.  According to Sicard, the conspiracy charge made his job easy in terms of proving Littlefield's guilt.  Sicard advised Littlefield of his rights and Littlefield assured him that he understood those rights.  According to Littlefield, he was informed that the Court would provide him with a lawyer "later on" in response to a question about whether he would be getting a lawyer.  After Sicard informed him of his rights the other agent, now known to be Agent Luce, informed him that they were going to ask him some questions and that it was important that he answer the questions truthfully.  According to Littlefield, Luce told him that if he did not answer the questions truthfully they would recommend to the judge that he not receive bail and he would be in jail until trial.  Given the circumstances, Littlefield elected to cooperate with the officers and answer their questions without invoking his right to counsel or his right to remain silent.

### *The Officers' Accounts*

The three officers present at the interview present a somewhat more muddled version of events than does Littlefield, although they all deny that anything was said about any adverse consequences stemming from judicial conduct if he refused to answer questions. To be fair, their lack of memory is understandable. They conducted nine interviews that morning and Littlefield, at least, was in court by 2:30 that afternoon. At least four other co-defendants on this indictment were also present in court for initial appearances on May 6, 2008. Obviously the officers were quite busy and attending to numerous concerns. None of the officers took any notes that day about what Agent Luce may have said to Littlefield before the interrogation began. None of the officers remembers Littlefield invoking his right to an attorney or his right to remain silent.

### *John Cremonini's version*

Cremonini quite honestly testified that he had only a 30-40% recollection of the interview. He was present that day because some of the defendants were charged with social security fraud and his interest, quite naturally, was concentrated on those defendants. Littlefield was not charged in connection with any social security violations and this interview did not have a high priority for him. He does not recall taking any notes. Cremonini does not believe that anything was said regarding adverse consequences if Littlefield refused to answer any questions.

Cremonini acknowledged that he was familiar with the issues raised by the motion to suppress because he had gone onto PACER and read the filings in the case, including Littlefield's declaration and the affidavit prepared by Agent Sicard. He acknowledged that it was hard for him to remember what was said from one interrogation

4

to another, but other than his claim that nothing was said about "adverse consequences" he has no distinct memory of this interview.

*Steven Sicard's version*

Sicard's recollection is that the Troy Littlefield interview was probably the sixth or seventh of nine consecutive interviews conducted that day.  He related that Luce conducted the primary interview with Littlefield and that he took notes and wrote the report of the interview.  He described Littlefield as very nervous during the interview, but not breaking down.  It was apparent to Sicard that Littlefield understood the gravity of the situation.  Sicard's testimony concerning the general tenor of the interrogation, confirmed by the other officers and by Littlefield, is that there was no screaming or shouting by anyone and that the interview was conducted in an orderly manner, lasting approximately 30 to 40 minutes.

According to Sicard, prior to administering Miranda, and after Littlefield was told what he was charged with, Agent Luce explained to Littlefield that they were going to conduct an interview and that it was important that any answers he gave be truthful;  that their report of the interview would be shared with the prosecuting attorney and, eventually, the judge;  that this conversation would be Littlefield's opportunity to tell his version of events, if he wanted that opportunity.  Following Luce's speech, Sicard read the Miranda warning to Littlefield.  Littlefield indicated he understood his rights, responded to all questions, and never indicated he wanted an attorney or to cease questioning.  According to Sicard, bail was never mentioned.

Sicard's original report of the event does not include any mention of whatever Agent Luce may have said in his preliminary speech.  The topic only came up during a

conversation with AUSA Casey in the later part of September after Littlefield filed the motion to suppress. Sicard then prepared the affidavit in this case, setting forth his recollection of Luce's pre-interview speech. Paragraph 6 of the affidavit recites the following:

> 6. Agent Luce explained to Defendant Littlefield that we were going to conduct an interview and write a report of everything that Defendant Littlefield said and that the report would be shared with the prosecuting attorney and, eventually, the judge. Agent Luce explained that this was Defendant Littlefield's opportunity to tell his version of events, if he wanted that opportunity.

(Sicard Aff. ¶ 6, Doc. No. 364-6.)

*Fred Luce's Version*

According to Fred Luce, he does not have a distinct memory of exactly what he may have said to Troy Littlefield, but he did acknowledge that he has a "standard procedure" or "spiel" that he follows when conducting an interview. He routinely tells the individual being interviewed that if he chooses to answer questions, he should answer truthfully and completely. Luce acknowledged that he does routinely inform suspects that if they cooperate, their cooperation would be noted to the assistant United States attorney. Luce does not recall mentioning that his report would be provided to the judge and seemingly took issue with the contrary representation in Sicard's affidavit because in the five years he has been working in the federal court he has never had the opportunity to make a recommendation to the judge regarding bail or any other matter. He adamantly denies telling Littlefield that bail would be denied if he remained silent and failed to cooperate with the investigation. According to Luce, none of the law enforcement officers suggested any adverse consequences if Littlefield did not talk to them.

### *This Fact-Finder's Version*

As Luce candidly acknowledged on cross-examination, the purpose of an interrogation is to get information from the accused and varying techniques may be used based upon individualized knowledge of the accused.  On May 6, these officers had a full plate and conducted nine separate interviews in a relatively short period of time following the same general procedures, but varying their presentations from interview to interview. It is unfortunate that their routine practice did not include audio or video recording of the interviews because then these small details of exactly what was said and which techniques were employed would not be left to failed memories and conflicting recollections.

Littlefield himself was a credible witness and he clearly came to believe early in the interview, as a result of *something* Luce said, that if he did not cooperate with the officers he might not be bailed and could remain in jail until his trial.  Littlefield is not a fool and he appeared to have an understanding of the criminal justice system and the gravity of the situation he faced.  Based upon Luce's "standard speech," Littlefield was admonished to answer questions truthfully if he chose to speak with the officers.   Based upon the memories of Sicard and Littlefield, apparently something was said about letting the judge know if Littlefield cooperated during the interview and, I find, it is more likely than not that Littlefield was told that if he did cooperate the judge would probably learn of it eventually.   Littlefield was also led to believe that his cooperation might well assist him in obtaining his release from custody pending trial during Luce's preliminary "spiel."

The interview itself was conducted in a non-hostile manner, without physical intimidation or coercion.  Littlefield understood his rights and agreed to talk with

investigators because he decided that cooperation was his best chance in terms of obtaining early release from custody.  He was clearly rational and was not under the influence of intoxicants or any other substances.  None of the officers behaved in an unduly coercive fashion, but Luce did make it clear to Littlefield at the beginning of the interview that cooperation was a significant factor.  Littlefield never refused to answer questions, never asked to speak to an attorney prior to questioning, and never demanded that the interview cease.  Had he done so, I am satisfied the officers would have honored his request.

Having determined, to the best of my ability, based upon the testimony of four individuals with varying recollections of what occurred, a probable likelihood of what happened during the interview, I must apply those facts to the legal framework of existing Fifth Amendment jurisprudence.  Of course, this case would be easy if I just accepted the officers' testimony that no mention of "bail" or early release from custody ever occurred.  I do not mean to suggest that the officers are deliberately lying in this case or that they behaved in some unduly coercive fashion.  Nevertheless, their memories were poor, ranging from a 30 % recollection by Cremonini to conflicting testimony between Sicard and Luce regarding whether the judge's knowledge of cooperation was ever mentioned.  The officers conducted nine interviews that day in the space of a few hours, but Littlefield only participated in one interview.  Littlefield's declaration, filed before Sicard or Luce weighed in with their version of the events, is surprisingly consistent with what they relate happened.  Littlefield's testimony at the hearing was not embellished with unbelievable details.  He simply recounted what he *remembered* Luce saying at the beginning of the interview.  That does **not** mean that Luce said the judge

would receive a copy of his report or that the Court would deny Littlefield bail if he

chose to remain silent.  I am persuaded that the conversation was more subtle than that

but that the clear impression conveyed to Littlefield was that his cooperation could

smooth the way to an early release and would eventually be noted to the judge.

### Discussion

The burden is on the government to prove, by a preponderance of the evidence,

that the defendant's statements were voluntary.  Lego v. Twomey, 404 U.S. 477, 489

(1972).  The government must show that, based on the totality of the circumstances, the

investigating agents did nothing to break or override the defendant's will, Chambers v.

Florida, 309 U.S. 227, 240 (1940), and that his statements were "the product of a rational

intellect and a free will," Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  See also

Lynumn v. Illinois, 372 U.S. 528, 534 (1963).  "[F]or a confession to be voluntary it

'must not be extracted by any sort of threats or violence, nor obtained by any direct or

implied promises, however slight, nor by the exertion of any improper influence.'"

United States v. Jackson, 918 F.2d 236, 241-42 (1st Cir. 1990) (quoting United States v.

Bram, 168 U.S. 532, 542-543 (1897), but noting that the "however slight" language lacks

force these days).  "[C]oercive police activity is a necessary predicate to the finding that a

confession is not 'voluntary'."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  It is

not, however, an independently sufficient predicate for suppression because evidence of

objectively coercive police conduct does not automatically establish that the defendant's

will was actually overborne.  Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002), cert.

denied, 540 U.S. 893 (2003).  The personal characteristics of the accused must also be

factored in, assuming there is evidence of objectively coercive police conduct.  Lynumn

v. Illinois, 372 U.S. 528, 534 (1963) (involving a defendant with no prior experience with criminal law who was threatened that she would lose her children and their financial assistance if she did not confess to distributing marijuana);  United States v. Rojas-Tapia, 446 F.3d 1, 7 (1st Cir. 2006) (indicating that a defendant's personal characteristics come into play where there is evidence of "police overreaching");  United States v. Palmer, 203 F.3d 55, 61-62 (1st Cir. 2000) (indicating that a defendant's characteristics come into play in "relation to" official coercion);  cf. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (involving voluntariness of consent to search).  I conclude, based on the totality of the circumstances, that Agent Luce's preliminary statements were not inherently coercive and that Littlefield's will was, in any event, not overborne.

A.      **Agent Luce's Preliminary Statement Was Not Inherently Coercive**

Littlefield characterizes the circumstances of his police interview as a situation in which the officers threatened him that a failure to cooperate would be communicated to the court.  (Mot. at 3-4.)  He cites United States v. Harrison, 34 F.3d 886 (9th Cir. 1994), as a factually analogous case.  In Harrison, the Ninth Circuit held that a statement given by the defendant should have been suppressed because "an agent implied that if Harrison did not give a statement he would inform the court that she had not cooperated."  Id. at 889.  The factual findings of the court below were to the effect that an agent told the defendant she might be facing 20 years and then "asked her whether she thought it would be better if the judge were told that she had cooperated or had not cooperated."  Id. at 890.  She cooperated.  The Ninth Circuit recognized that the case did not involve an explicit threat directed against the exercise of the defendant's right to remain silent, but concluded that the agent's implied representation that silence might be punished could not

be condoned.  Id. at 891.  In the Court's view:  "Although the agents thinly veiled their implied message behind a rhetorical question, Harrison could only conclude that she might suffer for her silence."  Id.  The Court did not ponder whether the defendant's will was actually overborne.  Rather, it held that the statement made to the defendant could not be condoned under any circumstances.  Id. at 891-92.

Littlefield argues that the Court should simply apply the rationale of Harrison and suppress the statements he made to the agents.  (Mot. at 5-6.)  I conclude that there are sufficient reasons for not applying the rule set out by the Ninth Circuit in Harrison to the facts of this case, insofar as the holding in Harrison extends to "implied" messages.  The distinction between a representation that a defendant may benefit from cooperation and a representation that he may suffer for failing to cooperate is one that our jurisprudence attaches significant meaning to.  See, e.g., United States v. Ramirez, 112 F.3d 849, 853 (7th Cir. 1997) ("Merely pointing out, what is anyway obvious, that cooperation with the police can result in a reduced sentence or other concessions down the road is not a promise and is not calculated to prevent the suspect from rationally considering whether or not to speak.");  United States v. Bye, 919 F.2d 6, 9-10 (2d Cir. 1990) ("We are unconvinced that the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience.");  United States v. Melinkas, 929 F. Supp. 276, 282 (S.D. Ohio 1996) ("Describing a hypothetical arrest scenario and alluding to it as a possibility in the context of a two and a half hour interrogation at a suspect's home is not impermissibly coercive.").  Here, Agent Luce spoke in terms of the potential benefits of cooperation.  He did not promise leniency and

11

he did not threaten retaliation if Littlefield chose not to cooperate during the interview. Specifically, Agent Luce made a preliminary speech to Littlefield that fairly suggested to Littlefield that his cooperation during the interview could redound to his benefit when it came to the matter of bail and that it would be reflected in the record that would eventually come before the court.  Agent Luce spoke in terms of possibilities, not promises.  Moreover, his representation concerning bail was not expressly tied to the court (or the prosecutor).  Unlike the agent in Harrison, Agent Luce did not imply (let alone threaten) that the failure to cooperate would be reported to the Court.  Nor did he promise leniency.  Rather, the message he conveyed was to the effect that, as to the immediate issue of detention, cooperation might be beneficial (without regard to the court) and that, eventually, cooperation would be a matter of record that might well benefit him when his case was before the court.  Pointedly, there is nothing false in these representations.  The Government has not moved for pretrial detention with respect to Littlefield.  Additionally, cooperation is a well known sentencing factor.  I conclude that such representations are not inherently coercive, such as would override the ordinary defendant's will.

**B.      Defendant Littlefield's Statements Were Voluntary**

Assuming for the sake of argument that Agent Luce's preliminary statements were objectively coercive, I conclude in the alternative that they were not so inappropriate that they necessarily result in suppression, without consideration of whether Littlefield's will was actually overborne.  Moreover, I conclude from the evidence that Littlefield made a voluntary decision to cooperate, and would have made that decision, irrespective of Agent Luce's preliminary statement.  Although Littlefield testified that he did not remain

silent and did not ask for a lawyer because he was afraid of not getting bail, he also acknowledged that, upon seeing the other individuals arrested that day in the building, he was able to deduce that his arrest had something to do with drug activity and that his situation was serious.  Based on this deduction and based on the representation that he was implicated in an alleged conspiracy, Littlefield effectively acknowledged that he wanted to explain to the agents that he had been clean for a long spell and had distanced himself from any drug activity engaged in by his associates.  Based on the overall picture presented to me during the hearing, including Littlefield's receipt of the Miranda warning, his acknowledgement that he understood its protections, his prior experience with police interrogation, the non-confrontational and orderly nature of the interview, and my conclusion about what someone in Littlefield's position would reasonably have understood from Luce's preliminary statement, I find that, more likely than not, Littlefield made a calculated and voluntary decision to cooperate and that his ability to exercise "a rational intellect and a free will," was not overborne by any threat or promise concerning his future treatment by the prosecutor or by the court.   Blackburn, 361 U.S. at 208.


### Conclusion

I recommend the Court adopt the proposed findings and deny the motion to suppress for the reasons set forth above.


### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the District Court is sought, together with a supporting memorandum, and

request for oral argument before the district judge, if any is sought, within
ten (10) days of being served with a copy thereof. A responsive
memorandum and any request for oral argument before the district judge
shall be filed within ten (10) days after the filing of the objection. Failure
to file a timely objection shall constitute a waiver of the right to *de novo*
review by the District Court and to appeal the District Court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

November 7, 2008